IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOSE ANTONIO AGUIRRE, et al. ) | |
| ) | |
| Plaintiffs, ) | Civil Action No.: 05 C 515 |
| ) | |
| v. ) | Suzanne B. Conlon, Judge |
| ) | |
| TURNER CONSTRUCTION COMPANY, et ) | |
| al. ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Jose Antonio Aguirre was injured while working as a bricklayer during the renovation of Soldier Field when he fell from a scaffold. He and his wife Maria Aguirre filed a fourteen-count personal injury and loss of consortium complaint against contractors involved in the renovation project. All but two of those defendants were dismissed from the case. Dkt. ## 20, 36. The remaining defendants are the construction manager for the project, TBMK, a joint venture, comprised of Turner Construction Company, Barton-Malow Company, and Kenny Construction, as well as Chicago Bears Stadium, Inc. Before the court are the parties' cross motions for summary judgment.

### FACTS

The facts material to summary judgment are undisputed unless otherwise noted. TBMK was the construction manager of the Soldier Field renovation project. TBMK's contract with the developer required TBMK to "take all necessary precautions and institute programs necessary to ensure the safety of the public and of workers performing the Work on the job, and to prevent accidents or injury to persons on the Site. Construction Manager shall comply with all Legal

Requirements relative to safety and the prevention of accidents." Pl. Ex. E. The contract required TBMK to appoint a safety superintendent to oversee safety on the project.

In furtherance of its obligations, TBMK promulgated an extensive safety program. All subcontractors were "solely responsible for the safety of their employees" and the "train[ing] and educat[ion of] their employees" concerning the safety program. Def. Exh. R. TBMK employed a contractor project safety coordinator and other personnel who oversaw safety on the project. Specifically, the safety coordinator assisted subcontractors in preparing their site safety programs, held monthly safety meetings, audited safety on the project and had the authority to stop work if he detected unsafe conditions. *Id.* TBMK's safety personnel walked the work site daily to evaluate compliance with the safety program. However, the program provided that "[t]he assignment of construction management or insurance safety personnel to monitor responsibilities for safety is not intended to relieve the contractor [sic] of their responsibility for providing a safe and healthy environment for their employees." *Id.* TBMK was empowered to stop work for safety reasons, authority which it sometimes exercised. TBMK could also fine or dismiss subcontractors or subcontractor employees for safety violations. *Id.* Subcontractors were required to make daily safety inspections of the job site and ensure that all subcontractor employees followed TBMK's safety program. Subcontractors were required to document weekly safety meetings concerning topics provided by TBMK.

TBMK contracted with A.L.L. Masonry to complete masonry work during the renovation. A.L.L. was required to "perform and furnish all the work, labor, services, materials, plant, equipment, tools, scaffolds, appliances and other things necessary for" the work. Def. Ex. P. A.L.L. "agree[d] that the prevention of accidents to workmen and property engaged upon or in

the vicinity of the Work is its responsibility." *Id.* A.L.L. prepared and executed a site-specific safety program and employed a project manager to oversee the project and administer the safety program. Def. Ex. Q. A.L.L. employed two additional full-time safety personnel to ensure that it complied with the safety program.

A.L.L. was required to build, inspect, and approve scaffolding for use by its employees. A.L.L. was required to follow 23 rules for scaffold construction promulgated by TBMK, including the use of fall protection for workers more than six feet off the ground. TBMK could require A.L.L. to correct deficiencies it observed in A.L.L.'s scaffolding. TBMK was not required to inspect all of the scaffolding, but did do so. TBMK imposed specific design requirements on the scaffold where Aguirre fell because the design required deviation from TBMK's general requirements.

Aguirre was employed by A.L.L. as a bricklayer during the Soldier Field renovation. At the time of the accident, Aguirre was laying bricks around garage-style doors on the north end of the field. Aguirre fell from a scaffold around one of the doors to the concrete eight to ten feet below when the foot planks supporting him gave way or flipped. The scaffold was completed and stocked with bricks and mortar earlier that morning by A.L.L. employees.

## ANALYSIS

### I. Legal Standard

On cross-motions for summary judgment, each movant must satisfy the requirements of Rule 56. *Clipco, Ltd. v. Ignite Design, LLC*, No. 04 C 5043, 2005 WL 1838436, at *3 (N.D. Ill. Aug. 1, 2005) (Conlon, J.). Summary judgment is appropriate when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment

as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once a moving party meets its burden, the non-moving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Silk v. City of Chicago*, 194 F.3d 788, 798 (7th Cir. 1999). The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the party opposing the motion. *Bay v. Cassens Transport Co.*, 212 F.3d 969, 972 (7th Cir. 2000). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## II. Chicago Bears Stadium

Aguirre asserts six claims against Chicago Bears Stadium: negligence (Count V); loss of consortium based on negligence (Count VI); *res ipsa loquitur* (Count IX); loss of consortium based on *res ipsa loquitur* (Count X); premises liability (Count XI); and loss of consortium based on premises liability (Count XII). Chicago Bears Stadium moves for summary judgment on all counts. Aguirre does not contest the motion. Therefore, summary judgment shall be entered for Chicago Bears Stadium and against Aguirre on Counts V, VI, IX, X, XI, and XII. *Walker v. McKee*, No. 93 C 5962, 1997 WL 182288, at *1 (N.D. Ill. Apr. 9, 1997) (Moran, J.).

## III. TBMK

Aguirre asserts four claims against TBMK: negligence (Count I); loss of consortium based on negligence (Count II); *res ipsa loquitur* (Count IX); and loss of consortium based on *res ipsa loquitur* (Count X). TBMK moves for summary judgment on all counts.

4

### A.     *Res Ipsa Loquitur*

Counts IX and X assert claims based on *res ipsa loquitur*. In Illinois, "[t]he purpose of the doctrine of res ipsa loquitur 'is to allow proof of negligence by circumstantial evidence when the direct evidence concerning cause of injury is primarily within the knowledge and control of the defendant.'" *Kolakowski v. Voris*, 415 N.E.2d 397, 400 (Ill. 1970). A plaintiff must prove two elements in order to establish an inference of negligence under *res ipsa loquitur*: (1) the injury ordinarily does not occur absent negligence; and (2) the instrumentality of the injury was within the defendant's exclusive control. *Gatlin v. Ruder*, 560 N.E.2d 586, 590 (Ill. 1986). TBMK argues that *res ipsa loquitur* should not apply because it never had control over the scaffold that caused Aguirre's injury. The court agrees. Aguirre argues that the floor boards on the scaffold gave way because it was negligently erected. It is undisputed that A.L.L. owned the scaffold and finished erecting and stocking the scaffold earlier on the morning of the accident. Aguirre fell from the scaffold soon after it was completed. TBMK contributed nothing to assembly of the scaffold and never had control over it. TBMK's summary judgment motion on Counts IX and X must be granted.

### B.     **Restatement of Torts Section 414**

The parties agree that the negligence claim asserted by Aguirre is governed by Section 414 of the Restatement (Second) of Torts. Section 414 provides: "[o]ne who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." Restatement (Second) of Torts § 414 (1965). The comments to Section 414 reveal that some degree of control

5

is necessary for the section to apply. Comment (a) discusses the amount of control that may be maintained without incurring liability:

> The employer may, however, retain a control less than that which is necessary to subject him to liability as master. He may retain only the power to direct the order in which the work shall be done, or to forbid its being done in a manner likely to be dangerous to himself or others.

*Id.* § 414 cmt. a. Comment b applies to a general contractor that:

> entrusts a part of the work to subcontractors, but himself or through a foreman superintends the entire job. In such a situation, the principal contractor is subject to liability if he fails to prevent the subcontractors from doing even the details of the work in a way unreasonably dangerous to others, if he knows or by the exercise of reasonable care should know that the subcontractors' work is being so done, and has the opportunity to prevent it by exercising the power of control which he has retained in himself.

*Id.* § 414 cmt. b. Comment c limits the application of section 414:

> In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.

*Id.* § 414 cmt. c. It is a factual issue whether a general contractor retained sufficient control to give rise to a duty of care. *Schreiber v. Idea Eng'g & Fabricating*, No. 99 C 6509, 2003 WL 220971491, at *2 (N.D. Ill. Sept. 5, 2003) (Moran, J.), *aff'd* 117 Fed. Appx. 467 (7th Cir. 2004) (unpublished). The question of control should be resolved on summary judgment where the evidence presented is insufficient to give rise to a factual issue.

Aguirre argues that TBMK's extensive safety program indicates sufficient control to impose a duty on TBMK, citing *Bokodi v. Foster Wheeler*, 728 N.E.2d 726 (1st Dist. 2000). In *Bokodi*, the plaintiff, a subcontractor employee, was injured while installing metal siding. The general contractor imposed a detailed safety program, which the plaintiff claimed established a duty on the general contractor. *Id.* at 728. The safety plan included weekly safety meetings and 29 specific guidelines that each subcontractor had to follow. *Id.* at 735. The general contractor also employed a project safety manager who inspected the job site to ensure compliance with the program and held weekly safety meetings. *Id.* Any employee of the general contractor was authorized to stop a subcontractor's work if it did not comply with the program. *Id.* The *Bokodi* court agreed with the plaintiff, holding that the pervasive safety program and enforcement by the general contractor indicated "that defendants retained control over the operative details of the work, superintended the entire job, and retained a right of supervision such that the subcontractors were not entirely free to do their work in their own way." *Id.* at 736.

*Bokodi* does not apply here because it is distinguishable on the facts. The safety program in *Bokodi* is similar to TBMK's safety program. They both included specific guidelines to be followed by subcontractors and provided a substantial enforcement mechanism for the general contractor. However, the contract in this case is distinguishable from the contract in *Bokodi*. The *Bokodi* court noted that the contract provided subcontractors would be in control of the operative details of their work. *Id.* at 735. In contravention to that provision, the general contractor "went to great lengths to enforce the safety standards at the work site." *Id.* The court did not cite any contractual provision that required the subcontractor to control safety. Here, the contract between TBMK and A.L.L. provided that A.L.L. controlled operative work details. The

7

contract also provided that A.L.L. controlled its workers' safety. A.L.L. was contractually required to comply with TBMK's safety program, design its own safety program tailored to TBMK's safety standards, and employ personnel to ensure compliance. Because A.L.L. was in control of its own safety by contract, *Bokodi* is inapposite.

TBMK points out that the rule in *Bokodi* is not applied consistently by Illinois courts:

> [E]ven where the employer or general contractor retains the right to inspect the work done, order changes to the specifications and plans, *and ensures that safety precautions are observed and the work is done in a safe manner*, no liability will be imposed on the employer or general contractor unless the evidence shows the employer or general contractor retained control over the "incidental aspects" of the independent contractor's work.

*Rangel v. Brookhaven Constructors, Inc.*, 719 N.E.2d 174, 178 (1st Dist. 1999) (emphasis added). Enforcement of safety standards does not constitute control over the "incidental aspects" of subcontractor work. *See, e.g., Martens v. MCL Constr. Corp.*, 807 N.E.2d 480, 490 (1st Dist. 2004) (general contractor's broad safety program with enforcement mechanism did not constitute control over means and methods of subcontractor's work); *Ross v. Dae Julie, Inc.*, 793 N.E.2d 68, 72 (1st Dist. 2003) (citing *Rangel*); *Beiruta v. Klein Creek Corp.*, 770 N.E.2d 1175, 1182 (1st Dist 2002) (same); *Fris v. Pers. Prods. Co.*, 627 N.E.2d 1265, 1272 (3d Dist. 1994) (enforcing safety does not constitute control). These cases are more persuasive that *Bokodi* because "[p]enalizing a general contractor's efforts to promote safety and coordinate a general safety program among various independent contractors at a large jobsite hardly serves to advance the goal of work site safety." *Martens*, 807 N.E.2d at 492.

TBMK had no duty of care with respect to Aguirre because it did not have control over the incidental details of A.L.L.'s work or its workers' safety. TBMK merely "ensure[d] that

8

safety precautions [were] observed and the work [was] done in a safe manner" in compliance with its standards and A.L.L.'s contractually required safety plan. *Rangel*, 719 N.E.2d at 178. This is not enough to establish the requisite control under § 414. Judgement must therefore be granted to TBMK on Counts I and II.

This result is buttressed by decisions by other judges of this court. "The mere retention of a general right to inspect the work, to order it stopped or resumed, to make suggestions or recommendations or prescribe alterations or deviations, or to enforce safety regulations, has been held insufficient" to constitute control over subcontractor work. *Idea Eng'g*, 2003 WL 22071491, at *2 (Moran, J.), *aff'd*, 117 Fed. Appx. 467. In *Idea*, the general contractor required the subcontractor to obey its safety standards. *Id.* at *2. The general contractor also employed two safety supervisors to inspect subcontractor work, hold weekly safety meetings, and stop subcontractor work for failure to comply with safety standards. *Id.* These facts were insufficient to create a duty for the general contractor under § 414. This case is analogous. *See also Pierce v. Chicago Rail Link, L.L.C.*, No. 03 C 7524, 2005 WL 599980, at *15 (N.D. Ill. Mar. 15, 2005) (Kennelly, J.) ("[t]he ability to enforce safety regulations . . . does not constitute control"); *Taylor v. Facility Constructors, Inc.*, 360 F. Supp. 2d 887, 893 (N.D. Ill. 2005) (Shadur, J.) (citing *Rangel*); *Dailey*, 2002 WL 31101672, at *3 (enforcing safety regulations does not constitute control over operative details of subcontractor work). Because TBMK owed Aguirre no duty, TBMK's argument that Aguirre's expert testimony should be disregarded need not be reached.

## CONCLUSION

Aguirre concedes that Chicago Bears Stadium is entitled to summary judgment. TBMK owed no duty to Aguirre because it did not retain sufficient control over the incidental aspects of

A.L.L.'s work. Therefore, defendants' summary judgement motions are granted, and Aguirre's cross-motion for summary judgment is denied.

ENTER:

*Suzanne B. Conlon*
Suzanne B. Conlon
United States District Judge

March 9, 2006